**RECEIVED**

MAY 12 2008

CLERK, U.S. DISTRICT COURT
MINNEAPOLIS, MINNESOTA

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,

     Plaintiff,

v.

JIMMIE GLEN MIMS (1),
ELIZABETH ANN NYBERG (2),
And ROBERT ALLEN KREISEL (3),

     Defendants.

CRIMINAL NO. 08-71 (JMR/JSM)

REPORT AND RECOMMENDATION

JANIE S. MAYERON, United States Magistrate Judge

     The above matter came on before the undersigned upon defendant Jimmie Glen Mims' Motion to Suppress Evidence Obtained as a Result of Search and Seizure [Docket No. 39]; defendant Elizabeth Ann Nyberg's Motions to Suppress Search and Seizure [Docket No. 51], to Suppress Statements [Docket No. 52], and to Declare Title 21 U.S.C. 841 Unconstitutional [Docket No. 53]; and upon defendant Robert Allen Kreisel's Motions to Suppress Statements, Admissions and Answers [Docket No. 57], to Suppress Evidence Obtained as a Result of Search and Seizure [Docket No. 61], and to Declare Title 21 U.S.C. Sec. 841(b)(1)(B)(vii) Unconstitutional [Docket No. 69].

     David Genrich, Assistant United States Attorney, appeared on behalf of the United States of America; Lee R. Johnson, Esq. appeared on behalf of defendant Jimmie Glen Mims; Paul C. Engh, Esq. and Shannon Rae Elkins, Esq. appeared on behalf of defendant Elizabeth Ann Nyberg; and George E. Rapaich, Esq. appeared on behalf of Robert Allen Kreisel. All defendants were personally present. The matter was

**SCANNED**

MAY 12 2008

U.S. DISTRICT COURT MPLS

referred to the undersigned by the District Court for a Report and Recommendation pursuant to 28 U.S.C. § 636 (b)(1)(B).

Based upon the pleadings, the pre-hearing submissions, exhibits submitted at hearing on April 8, 2008, and testimony taken from Officer Brian Stroshane, it is recommended that defendant Jimmie Glen Mims' Motion to Suppress Evidence Obtained as a Result of Search and Seizure [Docket No. 39] be DENIED; that defendant Elizabeth Ann Nyberg's Motions to Suppress Search and Seizure [Docket No. 51], to Suppress Statements [Docket No. 52], and to Declare Title 21 U.S.C. 841 Unconstitutional [Docket No. 53] be DENIED; and that defendant Robert Allen Kreisel's Motions to Suppress Statements, Admissions and Answers [Docket No. 57], to Suppress Evidence Obtained as a Result of Search and Seizure [Docket No. 61], and to Declare Title 21 U.S.C. Sec. 841(b)(1)(B)(vii) Unconstitutional [Docket No. 69] be DENIED.[1]

## I.    DISCUSSION

Mims, Nyberg and Kreisel are all charged with one count of conspiracy to manufacture and distribute marijuana, in violation of 21 U.S.C. §§ 841(b)(1)(B) and 846. At issue are two search warrants, one Mims' and Nyberg's residence, and one for Kreisel's residence; the Mirandized statements provided by Nyberg and Kreisel

---

[1]    Mims brought a motion to join in the other defendants' motions. [Docket No. 42]. At the hearing, his attorney clarified that he was seeking to join the motions of his co-defendants challenging the constitutionality of 21 U.S.C. § 841(b)(1)(B)(vii). As the Government did not object to his joinder in this motion, in the companion Order to this Report and Recommendation, the Court granted Mims' motion to join in the motion. Therefore, it is recommended that Mims' motion to declare 21 U.S.C. § 841(b)(1)(B)(vii) unconstitutional be DENIED.

following their arrests; and the constitutionality of the penalty provision, 21 U.S.C. § 841(b)(1)(B)(vii).

## II.    MOTIONS TO SUPPRESS EVIDENCE

### A.    Mims' and Nyberg's Motions to Suppress Search and Seizure at XXX West 104th Street [Docket Nos. 39, 51]

There were two separate search warrants for the residence located at XXX West 104th Street. The first warrant was for a flyover thermal image of the home. See Gov't Ex. 1 (Application for F.L.I.R. Warrant for Thermal Image of XXX West 104th Street). The second search warrant was for the search of the premises. See Gov't Ex. 2 (Application for Warrant for Premises of XXX West 104th Street). In their motions to suppress, Mims and Nyberg addressed only the second search of the premises. Because neither Mims nor Nyberg contested the thermal imagery search of XXX West 104th Street, the Court recommends denying that portion of their motions to suppress.[2] The balance of this Report and Recommendation focuses on the validity of the second search warrant, Government Exhibit 2.[3]

The warrant for the premises located at XXX West 104th Street was applied for by Detective Otterness and signed by Judge Tony Leung of Hennepin County District Court on January 30, 2008. It was executed on the following day, January 31, 2008.

---

[2]    The results of the flyover thermal image search were inconclusive. See Gov't Ex. 2.

[3]    Later on January 31, 2008, the same day as the search warrant was executed at XXX West 104th Street, Mims signed a Consent to Search the premises without a search warrant and a search was performed. See Gov't Ex. 3. Neither Mims nor Nyberg challenged that consent or the results of the search made pursuant to that consent. Therefore, the Court recommends denying any motion to suppress the consent search.

A summary of the relevant portions of the affidavit accompanying the search warrant described the basis for the warrant as follows:

> In January of 2008, the affiant, Detective Otterness, received information regarding a marijuana grow operation at XXX West 104th Street in Bloomington, Minnesota. This information was obtained from a cooperating defendant (CD #1) who was currently incarcerated on drug and weapons charges in the United States District Court of Minnesota. CD #1 stated that the residence was being utilized to grow high grade hydroponic marijuana and Psilocybin mushrooms. CD #1 stated that a white male named Jimmie Mims was living at the address.
>
> CD #1 stated that he/she began purchasing controlled substances from Mims in June of 2006; that he/she had purchased high grade marijuana from Mims on at least twenty occasions from the residence at XXX West 104th Street and as recently as late September or early October of 2007. CD #1 stated that Mims sold pound quantities of marijuana for $3,000 and ounce quantities for $300 to $400.
>
> CD #1 stated that when he/she was at the residence in September or October 2007, Mims had a large-scale marijuana growing operation in the basement of the residence, including sophisticated lighting and potting materials. CD #1 stated that there were approximately 200 mature plants growing at the time. CD #1 also stated that Mims was growing Psilocybin mushrooms and observed 60-70 mushrooms. CD #1 stated that he/she had also observed quantities of crack cocaine and methamphetamine inside the residence, and observed Mims in possession of a 9mm semi-automatic handgun and that Mims had it in the basement of the residence.
>
> While Detective Otterness was conducting a follow-up regarding this information, he learned that the Bureau of Criminal Apprehension also had information related to Mims and the XXX West 104th Street residence. Detective Otterness spoke with BCA Special Agent Henning regarding the investigation. Agent Henning had obtained information from another cooperating defendant, CD #2, who was currently charged in the United States District Court of Minnesota on drug trafficking charges. CD #2 stated that he/she had been to the XXX West 104th Street residence with another individual identified as Robert Smith, who is also currently charged in the United States District Court of Minnesota on drug trafficking charges. CD #2 stated that he/she had been to the XXX West 104th Street residence with Smith on multiple occasions and had contact with the residents, who CD #2 identified as Mims and a female named Elizabeth Nyberg. CD #2 had been at the residence as recently as late October of 2007.

CD #2 stated that Smith advised CD #2 that Smith and Mims utilized the XXX West 104th Street residence to grow marijuana and mushrooms, that Smith stashed cocaine and methamphetamine at the residence, and that the growing operation had been in operation for several years.

In December of 2007, CD #2 directed Special Agent Henning to the West 104th Street residence and identified it as the residence Mims and Smith used for their drug trafficking operation.

Special Agent Henning subpoenaed records from Xcel Energy for XXX West 104th Street and two neighboring residences. Detective Otterness indicated that the records showed that the XXX West 104th Street residence was using approximately 2-3 times the amount of electricity as the neighboring residences. Based on his training and experience, which included previous indoor marijuana growing operations, Detective Otterness believed this to be indicative of a marijuana growing operation.

On January 22, 2008, Detective Otterness's partner, Officer Stroshane, obtained a search warrant to conduct a flyover to gauge the amount of heat radiating from the residence at West 104th Street.[4] The flyover warrant was executed but the results were inconclusive due to the sub-zero temperature that evening.

On January 29, 2008, Detective Otterness attempted to obtain trash from the residence on its scheduled day for removal, but was unable to because the garbage was never set curbside.

Detective Otterness confirmed through Minnesota Driver and Vehicle Services that Mims listed XXX West 104th Street as his home address.

See Gov't Ex. 2.

1.     Credibility and Reliability of Informants' Information

Mims and Nyberg each move to suppress evidence obtained during the search

and seizure of their residence on January 31, 2008 on grounds that the search warrant,

---

[4]     According to the affidavit accompanying the application for the thermal imaging search warrant, the energy consumption records for the XXX West 104th Street residence for the period of September 2007 through January 2008 were received by Detective Otterness's partner, Officer Brian Stroshane. See Gov't Ex. 1, Bates Stamp No. 000007.

Government Exhibit 2, lacks probable cause. Both contend that the search warrant affidavit provides insufficient information regarding the credibility of the cooperating defendants, and that the observations of the cooperating defendants in September and October of 2007 were too old to support a search conducted on January 31, 2008. In addition, Nyberg claims that the information from the cooperating defendants was uncorroborated, and the warrant was lacking particularity in its description of things to be seized. Finally, Mims maintains that the Leon good faith exception, permitting an otherwise invalid search warrant to be upheld if it was executed by an officer acting in objective good faith on a warrant issued by a judge or magistrate is not applicable to the case at hand. See United States v. Leon, 468 U.S. 897 (1984).

Ordinarily, searches pursuant to a warrant are reviewed to determine if there was probable cause for the search in the search warrant application and affidavit. Illinois v. Gates, 462 U.S. 213, 236 (1983). "Probable cause exists when, given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place." United States v. Fladten, 230 F.3d 1083, 1085 (8th Cir. 2000). The task of a court issuing a search warrant is "simply to make a practical, common sense decision whether, given all the circumstances set forth in the affidavit. . . including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." Gates, 462 U.S. at 238. In reviewing this decision of the issuing court, the duty of the reviewing court is simply to ensure that the issuing court had a substantial basis for concluding that probable cause existed. Id. at 238-39 (citation omitted); United States v. LaMorie, 100

6

F.3d 547, 552 (8th Cir. 1996) ("Our duty as the reviewing court is to ensure that the issuing judge had a 'substantial basis' for concluding that probable cause existed, and we owe substantial deference to the determination of probable cause by the issuing judge.") (citation omitted)).

As to what this Court should consider when reviewing a search warrant for probable cause, "[w]hen the [issuing judge] relied solely on the affidavit presented to him, 'only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause.'" United States v. Solomon, 432 F.3d 824, 827 (8th Cir. 2005) citing United States v. Etheridge, 165 F.3d 655, 656 (8th Cir. 1999) (quoting United States v. Gladney, 48 F.3d 309, (8th Cir. 1995)). "'Probable cause may be based on the collective knowledge of all law enforcement officers involved in an investigation and need not be based solely upon the information within the knowledge of the officer on the scene if there is some degree of communication.'" United States v. Wells, 347 F.3d 280, 287 (8th Cir. 2003) (quoting United States v. Horne, 4 F.3d 579, 585 (8th Cir. 1993)). Additionally, "the police possess specialized law enforcement experience and thus may 'draw reasonable inferences of criminal activity from circumstances which the general public may find innocuous.'" United States v. Mendoza, 421 F.3d 663, 667 (8th Cir. 2005) (quoting United States v. Caves, 890 F.2d 87, 94 (8th Cir. 1989). Furthermore, "[b]ecause probable cause requires only a probability or substantial chance of criminal activity, rather than an actual showing of criminal activity, the police need not have amassed enough evidence to justify a conviction prior to making a warrantless arrest." Mendoza, 421 F.3d at 667 (citations omitted).

"When the affidavit is based on information from an informant, the informant's reliability, veracity, and basis of knowledge are relevant to whether the affidavit provided probable cause to support the search." Solomon, 432 F.3d at 827 (citing LaMorie, 100 F.3d at 553). Consequently, with respect to informants used to develop probable cause to support the issuance of a search warrant,

> [t]he core question . . . is whether the information is reliable. Information may be sufficiently reliable to support a probable cause finding if the person providing the information has a track record of supplying reliable information, or if it is corroborated by independent evidence. Draper v. United States, 358 U.S. 307, 313, 79 S.Ct. 329, 333, 3 L.Ed.2d 327 (1959) (Draper). If information from an informant is shown to be reliable because of independent corroboration, then it is a permissible inference that the informant is reliable and that therefore other information that the informant provides, though uncorroborated, is also reliable. Gates, 462 U.S. at 233-34, 103 S.Ct. at 2329-30; Draper, 358 U.S. at 313, 79 S.Ct. at 333.

United States v. Williams, 10 F.3d 590, 594 (8th Cir. 1993). The credibility and reliability of an informant are not "separate and independent requirements to be rigidly exacted in every case." Gates, 462 U.S. at 230. For that reason, courts have determined an informant's information to be credible and reliable in those situations where the information is based on his or her first-hand observations, or the informant has provided information against his or her penal interest or that implicates him or herself, or the informant's information is corroborated by another informant or by the investigating officers, even where the facts which are corroborated are seemingly innocuous. See e.g. Solomon, 432 F.3d at 827 (finding sufficient probable cause where informant had personally discovered evidence of a crime and provided police with a detailed description); United States v. Gabrio, 295 F.3d 880, 883 (8th Cir. 2002) (concluding that an informant's information was reliable in part because "[t]he tip here was timely and

'based on the informant's first-hand observations, not merely from rumor or innuendo'")
(citations omitted); United States v. Tyler, 238 F.3d 1036 (8th Cir. 2001) ("The
corroboration of minor, innocent details can suffice to establish probable cause.")
(quoting United States v. Ramos, 818 F.2d 1392, 1397 n. 7 (8th Cir. 1987); United
States v. Fulgham, 143 F.3d 399, 401 (8th Cir. 1998) (finding that where "the
information given by the first informant was corroborated with specific, consistent details
provided by the second informant," probable cause existed); LaMorie, 100 F.3d at 553
(statements against the penal interest of an informant carry considerable weight in
determining credibility); Williams, 10 F.3d at 594   (finding informant's information
credible because it was based on his first-hand observations, not merely from rumor or
innuendo."); United States v. McBride, 801 F.2d 1045, 1047 (8th Cir. 1986) ("even in
cases involving the higher degree of reliability needed to establish probable cause, it is
immaterial that the details corroborating an informant's tip are as consistent with
innocent conduct as with illegal activity"); United States v. Reivich, 793 F.2d 957, 959,
960 (8th Cir. 1986) (finding that the totality of circumstances standard set forth in Gates
permits, "for example, an informant's clear basis of knowledge could be balanced
against, rather than automatically overruled by, that informant's lack of a 'track record'
of reliability"; also finding "it is not necessary to a finding of reliability that the
corroboration extend to illegal activity as well as to innocent details").

Based on these principals, Mims' and Nyberg's argument that the search warrant
lacks probable cause because it provides no information regarding the credibility and
reliability of the cooperating defendants is not supported by the record. In this case, the
affidavit set forth that CD #1 had been inside the XXX West 104th Street residence on

9

multiple occasions and had purchased marijuana from Mims at the residence on at least twenty occasions since June of 2006. In addition, CD # 1 stated that in September or October of 2007, he or she had observed in the basement of the house the growing operation, approximately 200 mature marijuana plants, Psilocybin mushrooms, crack cocaine, methamphetamine and a gun, and that he or she had purchased marijuana in late September or early October of 2007. The detailed information provided by CD #1 was based on first-hand observations, and it is clear that the informant had a basis for the knowledge regarding the alleged criminal activities occurring at the XXX West 104th Street residence. These robust personal observations of CD #1 tend to show that the information is reliable.

Furthermore, CD #1 admitted purchasing drugs on numerous occasions, statements that were made against his or her own penal interest, and the information provided by CD #1 was independently corroborated by both CD #2 and investigating officers. CD #2 had been at the residence multiple times, including in late October 2007, and had informed Special Agent Henning in a separate investigation that the residence was being utilized to grow marijuana and mushrooms and that cocaine and methamphetamine was stashed at the residence. This information was consistent with the information provided by CD #1. The police also partially corroborated the information provided by the cooperating defendants. In December 2007, CD #2 took Special Agent Henning to the residence at XXX West 104th Street. Detective Otterness confirmed through Bloomington Police Department records and the Minnesota Department of Motor Vehicles that Mims resided at XXX West 104th Street, Bloomington, Minnesota. Moreover, officers obtained information from Xcel Energy that

10

the electric energy consumption from XXX West 104th Street was three times higher than two neighboring homes. Corroboration from facts such as increased electrical usage to support a search warrant for a residence believed to be involved in a marijuana grow operation can compensate for lack of information about an informant's reliability or the basis of his knowledge. See United States v. Olson, 21 F.3d 847, 850 (8th Cir.), cert. denied, 513 U.S. 888, 115 S.Ct. 230, 130 L.Ed.2d 155 (1994).

Based on the cooperating defendants' first-hand observations, statements against by CD #1 against his or her penal interest, and corroboration of CD #1's information by CD #2 and law enforcement, the Court finds that the credibility and reliability of the cooperating defendants was sufficiently established. In fact, where two informants' tips are reciprocally corroborative, it is sufficient to render their "information enough to support a finding of probable cause." Fulgham, 143 F.3d at 401 (citation omitted).

### 2. Staleness

Mims and Nyberg also argued that the information provided by the cooperating defendants was stale, and therefore could not support a finding of probable cause to issue the search warrant. "Probable cause must exist when a warrant is issued, not merely at some earlier time." LaMorie, 100 F. 3d at 544 (citations omitted). "There is no bright-line test for determining when information is stale. Whether the averments in an affidavit are sufficiently timely to establish probable cause depends on the particular circumstances of the case, and the vitality of probable cause cannot be quantified by simply counting the number of days between the occurrence of the facts supplied and the issuance of the affidavit." United States v. Koelling, 992 F.2d 817, 822 (8th Cir.

1993) (citing United States v. McCall, 740 F.2d 1331, 1336 (4th Cir. 1984)). Thus, "the lapse of time is least important when the suspected criminal activity is continuing in nature and when the property is not likely to be destroyed or dissipated." United States v. Horn, 187 F.3d 781, 786 (8th Cir. 1999) (citations omitted). See also United States v. Ozar, 50 F.3d 1440, 1446 (8th Cir.), cert. denied, 516 U.S. 871, 116 S.Ct. 193, 133 L.Ed.2d 128 (1995) ("The passage of time is less significant when there is cause to suspect continuing criminal activity.") (citations omitted). Further, "where recent information corroborates otherwise stale information, probable cause may be found." Id. at 1446 (quotation and citation omitted). Cases involving marijuana grow operations or patterned drug trafficking acknowledge that older information is not necessarily stale due to the ongoing nature of the crimes. See e.g. United States v. Hammond, 351 F.3d 765, 771-72 (6th Cir. 2003) (informant's tip regarding an indoor marijuana grow operation received five months prior to the issuance of a search warrant was not stale because the crime of drug trafficking was ongoing, the defendant's location was established, the drugs were likely to be there for an indefinite period of time, and the place to be searched constituted a secure operational base); United States v. Feliz, 182 F.3d 82, 87 (1st Cir. 1999) (where agents could reasonably have believed that defendant's drug trafficking was of a continuous and ongoing nature, three-month-old drug transaction information was not stale); United States v. Myers, 106 F.3d 936, 939 (10th Cir. 1997) (six-month old tip regarding marijuana grow operation deemed not stale because drug activities were "ongoing and continuous," so that the passage of time did not render the information stale); United States v. Greany, 929 F.2d 523, 525 (9th Cir. 1991) (two-year-old information on marijuana growing operation found not stale

because "[w]hen the evidence sought is of an ongoing criminal enterprise, such as marijuana growing, rather than that of a completed act, greater lapses of time are permitted if the evidence in the affidavit shows the probable existence of the activity at an earlier time"); United States v. Minis, 666 F.2d 134 (5th Cir.), cert. denied, 456 U.S. 946, 102 S.Ct. 2013, 72 L.Ed.2d 469 (1982) (finding that the ongoing nature of a marijuana-cultivating operation warranted the magistrate's inference that marijuana plants observed in June would still be present in October). "These cases properly stand for the proposition that, in some circumstances, the very nature of the evidence sought may suggest that probable cause is not diminished solely by the passage of time." Williams, 10 F.3d at 595 n. 3.

Here, the criminal activity was both continuing in nature and corroborated by recent information that suggested that it was ongoing up to the date of the issuance of the search warrant. Both cooperating defendants stated that the grow operation had been operative for several years and was last observed in September or October of 2007. While it was possible that the grow operation, including the plants, equipment and set-up, had been destroyed or removed from the premises between September or October of 2007 and January 2008, given that the venture had been going on for a lengthy period of time, it was just as likely that it would still be present on the premises three months later. See LaMorie, 100 F.3d at 554 (finding that while it was possible that the stolen property could have been removed from the premises to be searched sometime after the witness had last seen it, it was equally possible that it remained on the premises given the continuing nature of the criminal activity). In any event, the electric energy consumption information obtained for XXX West 104th Street and the

13

neighboring homes, not only corroborated the continuing nature of criminal activity, but confirmed that it was occurring within days of issuance of the warrant.[5] The information provided by the cooperating defendants was not stale.

### 3. Particularity

Nyberg also argued that the warrant lacked particularity in its description of things to be seized. The sum total of Nyberg's argument is that the warrant's list of items to be seized is boilerplate and therefore encourages "rummaging." Mot. to Suppress Search and Seizure, p. 2 [Docket No. 51].

"To satisfy the particularity requirement of the Fourth Amendment, the items to be seized and the places to be searched must be described with sufficient particularity as to enable the searcher to locate and identify the places and items with reasonable effort and to avoid mistakenly searching the wrong places or seizing the wrong items." United States v. Gleich, 397 F.3d 608, 611 (8th Cir. 2005) (citations omitted). "The degree of specificity required will depend on the circumstances of the case and on the type of items involved." Horn, 187 F.3d at 788. The particularity requirement "is a standard of 'practical accuracy' rather than a hypertechnical one." United States v. Peters, 92 F.3d 768, 769-70 (8th Cir. 1996) (quoting United States v. Lowe, 50 F.3d 604, 607 (8th Cir.), cert. denied, 516 U.S. 900, 116 S.Ct. 260, 133 L.Ed.2d 183 (1995)).

---

[5]     Detective Otterness' affidavit did not state when the energy consumption records were obtained from Xcel Energy by Special Agent Henning. See Gov't Ex. 1, Bates Stamp No. 000019. However, a fair reading of the affidavit indicates that the records were obtained sometime between December 2007 when Special Agent Henning met with CD #2 and was directed to the XXX West 104th Street residence, and January 22, 2008, when Officer Stroshane conducted the flyover of the residence. See Olson, 21 F.3d at 848 n. 2 (finding that an ambiguous affidavit can reasonably be read to support the inference reached by the court).

See also United States v. Jansen, 470 F.3d 762, 766 (8th Cir. 2006) ("The standard used to determine whether a warrant description is sufficiently specific is one of 'practical accuracy,' and the degree of specificity may change according to circumstances.") (quoting United States v. Porter, 831 F.2d 760, 764 (8th Cir. 1987)).

The list of items to be seized was included with the affidavit as Attachment A. See Gov't Ex. 2, Bates Stamp No. 000023. A copy of Attachment A is attached to this Report and Recommendation as Exhibit A.

Boilerplate or not, the attachment is detailed and thorough, with the exception of the request for seizure of "computer hard drives and disks and the stored data therein." Id. The attachment provided the searching officers with sufficient information to identify the proper items to be seized and to avoid seizing the wrong items. Furthermore, many of the items listed, while at first blush appeared to be general categories of objects to be seized (for example, receipts, invoices, notes, journals, ledgers, and other documents) were specific as to their relationship with controlled substances, firearms, or other possible illegal activities. Gov't Ex. 2, Attachment A. See Tyler, 238 F.3d at 1039 (where search warrant permitted the police to collect a wide range of items such as documents, weapons, and personal phone/address books, but only if they were related to drug activities, search warrant was sufficiently specific).

On the other hand, as to the request for seizure of computer hard drives and disks and the stored data, the Court finds that this category of items to be seized was not stated with sufficient particularity. However, a search warrant that properly authorizes a search for certain items, but is invalid as to other items, does not require suppression of all evidence seized pursuant to the warrant. Instead, "where portions of

15

a search warrant fail to describe some of the items of the search with sufficient particularity, this circuit has adopted the severance approach, permitting the insufficiently particular portions of the warrant to be severed from the rest. In such instances, only items seized under the invalid portions of the warrant must be suppressed." United States v. Krasaway, 881 F.2d 550, 553 (8th Cir. 1989) (citations omitted). See also United States v. Timley, 443 F.3d 615, 622 (8th Cir. 2006) ("[W]here the warrant is invalid only in part, the warrant is 'severable,' and items seized pursuant to valid portions of the warrant need not be suppressed.").

Here, no computer hard drives, disks or stored data were seized. See Gov't Ex. 2, Attachment A, Bates Stamp Nos. 000024-27. As such, even if this portion of the warrant were severed, the evidence seized from the residence would clearly fall within valid portions of warrant, and suppression of the evidence seized in this case is not required. See Krasaway, 881 F.2d at 553 (holding that defendant's motion to suppress was properly denied because the actual items seized fell within the valid portions of the warrant). Nyberg's particularity argument is rejected.

### 4. Leon Exception

Finally, Mims argued that the warrant was so lacking in probable cause that the good faith exception set forth in United States v. Leon does not save the warrant. Because the Court finds that the warrant contained sufficient probable cause, this argument is moot. Nevertheless, the Court will briefly address the assertion.

In Leon, the court stated that "'searches pursuant to a warrant will rarely require any deep inquiry into reasonableness,' for 'a warrant issued by a magistrate normally suffices to establish' that a law enforcement officer has 'acted in good faith in

16

conducting the search.'" Leon, 468 U.S. at 922 (citations omitted).  However, the Leon Court noted that there are certain instances when "the purpose of the exclusionary rule – deterring police misconduct – will not be served by suppressing illegally seized evidence." United States v. Martin, 833 F.2d 752, 755 (8th Cir. 1987); Leon, 468 U.S. at 922-23.  "When a police officer acts in an objectively reasonable manner in reliance on a subsequently invalidated search warrant, there is no rational reason for suppressing the fruits of the search." Martin, 833 F.2d at 755.  The Court's "good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." Leon, 468 U.S. at 923 n. 23.

In Leon, the Supreme Court found four instances when suppression remained appropriate.  First, suppression is appropriate "if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth." Leon, 468 U.S. at 923.  Second, suppression is appropriate "where the issuing magistrate wholly abandoned his judicial role in the manner condemned in Lo-Ji Sales, Inc. v. New York, 442 U.S. 319, 99 S.Ct. 2319, 60 L.Ed.2d 920 (1979); in such circumstances, no reasonably well trained officer should rely on the warrant." Id.  Third, the court found that an officer would not "manifest objective good faith in relying on a warrant based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'" Id. (quoting Brown v. Illinois, 422 U.S. 590, at 610-611, (Powell, J., concurring in part).  Finally, the court found that "depending on the circumstances of the particular case, a warrant may be so facially deficient – i.e., in

17

failing to particularize the place to be searched or the things to be seized – that the executing officers cannot reasonably presume it to be valid." Id.

Mims relied upon the third instance to support his motion to suppress, asserting that it was unreasonable for police to believe the cooperating defendants' stale observations were sufficient to support probable cause. As discussed above, while the cooperating defendants' observations were approximately three to four months old, the suspected criminal activity was ongoing. Further, the officers corroborated the information provided by the cooperating defendants with information obtained from Xcel Energy on January 22, 2008, regarding the consumption of electricity of the XXX West 104th Street residence and neighboring homes for the period of September 2007 through January 2008.[6] Even if this Court had found that there was no probable cause

---

[6]     While Detective Otterness indicated in his affidavit that Special Agent Henning had subpoenaed records from Xcel Energy for XXX West 104th Street and two neighboring residences, Detective Otterness did not indicate the date of the subpoena or the time period of the records covered by the subpoena. However, he did state that on January 22, 2008, his partner, Officer Stroshane, obtained a search warrant to conduct a flyover to gauge the amount of heat radiating from the residence at XXX West 104th Street. Consequently, it is clear that Detective Otterness would have known about the facts that Officer Stroshane stated in his affidavit accompanying the application for the thermal imaging search warrant, which included that the energy consumption records obtained by Special Agent Henning on January 22, 2008, from Xcel Energy were for the period of September 2007 through January 2008. See United States v. Marion, 238 F.3d 965, 969 (8th Cir. 2001) ("When assessing the objective [reasonableness] of police officers executing a warrant, we 'must look to the totality of the circumstances,' including any information known to the officers but not presented to the issuing judge."); United States v. Simpkins, 914 F.2d 1054, 1057 (8th Cir. 1990) (finding that in assessing the objective good faith of the officers executing the warrant, the court "'must look to the totality of the circumstances,' including any information known to the officers but not presented to the issuing judge.") (quoting United States v. White, 890 F.2d 1413, 1419 (8th Cir. 1989) (citations omitted)); United States v. Martin, 833 F.2d 752, 755 (8th Cir. 1987) ("[W]hen assessing good faith we can and must look to the totality of the circumstances including what Officer Powers knew but did not include in his affidavit.").

stated within the four corners of the search warrant, it finds that the officers were reasonable in their reliance on the issuance of the warrant.

### B. Kreisel's Motion to Suppress Evidence [Docket No. 61]

Kreisel claimed that the warrant and affidavit for his residence, located at XXXX Bryant Avenue South, lacked probable cause. He asserted that there was no effort by law enforcement to corroborate the stories of Mims and Nyberg, that the credibility of Mims and Nyberg was not established, and that the information provided by Mims and Nyberg was stale. Kriesel Post-Hearing Mem. in Support of Mot. to Suppress, p. 3 [Docket No. 76].

On January 31, 2008, Detective Otterness applied for a search warrant for the premises located at XXXX Bryant Avenue South; it was signed by Judge Denise Reilly of Hennepin County District Court and executed on the same day. The warrant sought the very same items as were requested in the application for the search warrant of XXX West 104th Street. Compare, Gov't Ex. 2, Attachment A and Gov't Ex. 4, Attachment A.

A summary of the relevant portions of the affidavit accompanying the search warrant described the basis for the warrant as follows:

A search warrant was executed at XXX West 104th Street in Bloomington, Minnesota on January 31, 2008, during which agents and officers located a sophisticated marijuana growing operation in the lower level of the residence. This growing operation included grow lights and medium, ballasts, timers, exhaust fans and a portable dioxide cylinder. Approximately 158 marijuana plants were recovered, along with dried marijuana leaves and stems and suspected psilocybin mushrooms. Agents also recovered digital scales, drug smoking paraphernalia, and information indicating that Jimmie Mims and Elizabeth Nyberg resided at the residence. Mims and Nyberg were subsequently arrested and booked.

19

During a taped, <u>Mirandized</u> interview of Nyberg, she admitted knowing about the growing operation in the basement, and stated that she and Mims were the only people residing at the residence. Nyberg stated that Mims took care of the operation, and that the grow had been operational for approximately one-and-a-half years. Nyberg stated that she and Mims had other controlled substances in the residence, including crack cocaine, heroin, and methamphetamine. Nyberg also stated that Mims was assisted in getting the marijuana grow operational by another male identified as Robert Kreisel or "Slow Bob." Nyberg stated that Kreisel helped to get the grow light system wired correctly and vented the growing system to the exterior of the residence. Nyberg stated that she was present when Mims spoke with Kreisel about the marijuana grow operation that Kreisel has at his residence. Nyberg stated that Kreisel lived near a Holiday gas station on XX Street in Bloomington, Minnesota.

Detective Otterness located Kreisel in the Bloomington Police Department records system. Kreisel listed a home address of XXXX Bryant Avenue South in Bloomington, which was two blocks from a Holiday gas station on XX Street in Bloomington. Nyberg positively identified a photograph of Kreisel obtained from Minnesota Driver and Vehicle Services.

During a taped, <u>Mirandized</u> interview of Mims, he admitted knowing about the growing operation in his basement and stated he was assisted in setting up the operation by a male identified as "S.B." Mims positively identified a photograph of Kreisel obtained from Minnesota Driver and Vehicle Services. Mims further stated that Kreisel has assisted approximately six other individuals in setting up indoor marijuana grow operations in Bloomington. Mims stated he was at Kreisel's residence in November of 2007 and observed approximately 10 marijuana plants growing in the garage.

Detective Otterness further checked Bloomington Police Department records and learned that Kreisel was reportedly involved in distribution and manufacturing methamphetamine and marijuana at his XXXX Bryant Avenue South residence in October of 2004. The Bloomington Police Department received the information from a concerned citizen. No charges stemmed from that investigation.

Detective Otterness also learned that Kreisel was arrested by the Drug Enforcement Administration in 1997 in South Dakota for manufacturing and possessing methamphetamine. Kreisel also had a previous arrest in Iowa in 1981 for possession of a controlled substance.

Gov't Ex. 4.

The Court finds that the search warrant of Kreisel's residence is supported by probable cause. The reliability and credibility of Mims and Nyberg were established by the detailed statements of Mims and Nyberg as to Kreisel's involvement with marijuana growing operations, and each ~defendant~ corroborated the information provided by the other. Further, the statements of Mims and Nyberg were made against their own interest, making them even more credible. Law enforcement also corroborated Mims' and Nyberg's statements. Prior to applying for the search warrant, Detective Otterness obtained Kreisel's information from both the Bloomington Police Department and the Department of Vehicle Services, and confirmed that his address was at the location provided by Nyberg and Mims, and was indeed near the Holiday gas station as reported by Nyberg. Both Mims and Nyberg reported that Kreisel was responsible for helping to wire the grow light system properly and for venting the system to the exterior of the residence. This information was consistent with the officers' observations at the time they executed the search of the residence at XXX West 104th Street at which time they found a sophisticated marijuana growing operation, including among other items, grow lights and exhaust fans in the basement of the residence at XXX West 104th Street. After Mims and Nyberg implicated Kreisel in criminal activities involving a marijuana grow operation at their residence, grow operations for six other persons, and a grow operation at Kreisel's own residence, Detective Otterness also obtained Kreisel's criminal background information, which confirmed that he had previously been a suspect in several incidents involving controlled substances, including the manufacture and distribution of marijuana from his XXXX Bryant Avenue South residence. Law enforcement may use a suspect's criminal history or evidence of prior unlawful activity

to corroborate information provided by informants. See Solomon, 432 F. 3d at 828, n. 2 (finding that an affidavit reciting that defendant had a felony record increased the credibility of the tip) (citing Gabrio, 295 F.3d at 883); United States v. Bynum, 293 F.3d 192, 196-200 (4th Cir. 2002) (informant's tip that defendant had a large quantity of heroin at his residence corroborated by information that defendant was a convicted felon and that a recent search of defendant's residence had resulted in the seizure of drug paraphernalia); United States v. Weaver, 99 F.3d 1372, 1380-81 (6th Cir. 1996) (recognizing that a suspect's prior unlawful activity or related convictions can corroborate information supplied by informants); United States v. Taylor, 985 F.2d 3, 6 (1st Cir. 1993) ("An affiant's knowledge of the target's prior criminal activity or record clearly is material to the probable cause determination.").

As to Kreisel's contention that the information provided by Mims and Nyberg was stale, he argued that Mims and Nyberg stated that Kreisel had helped them wire and vent their grow operation, and that their operation had been running for one-and-a-half years; therefore, any help Kreisel supplied was at least one-and-a-half years old. Kreisel Post-Hearing Mem. in Support of Mot. to Suppress, p. 2 [Docket No. 76]. Furthermore, Kreisel pointed out that Nyberg's statement that she heard Mims and Kreisel discuss a grow operation was undated in the affidavit, and Mims' observation of the ten marijuana plants in Kreisel's garage was in November of 2007, three months prior to the issuance of the search warrant.

"Probable cause exists when, given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place." Fladten, 230 F.3d at 1085. Here, the

totality of circumstances encompassed Detective Otterness's experience with marijuana grow operations as a law enforcement officer, the credibility and reliability of the cooperating defendants as discussed above, the corroborating information obtained by Detective Otterness as to the location of Kreisel's residence and his prior criminal history, the information that Kreisel was involved in several grow operations, including a grow operation that was observed at his home within the past three months, and the continuing nature of grow operations. Given all of this information, it was reasonable for Detective Otterness to believe that evidence of a crime would be found at Kreisel's residence at the end of January 2008.

In sum, the Court finds that where, as here, law enforcement were faced with an ongoing marijuana grow operation, their reliance on the information provided by Mims and Nyberg was permissible, and Kreisel's motion to suppress the search of his residence should be denied.

## III.    MOTIONS TO SUPPRESS STATEMENTS

### A.    Nyberg's Motion to Suppress Statements [Docket No. 52]

In her motion to Suppress Statements, Nyberg argued that she did not knowingly and voluntarily waive her Miranda rights, and her statement was therefore involuntarily rendered. Nyberg Mot. to Suppress Statements, p. 1 [Docket No. 52]. In her post-hearing memorandum, Nyberg additionally challenged the admissibility of her statement on grounds that it was the fruit of her illegal arrest. Nyberg Post-Hearing Mem. in Support, p. 2 [Docket No. 74].

23

1.   Arrest

Nyberg maintained that because she was merely present during the execution of the search warrant, there was no probable cause to arrest her. The Court disagrees.

A warrantless arrest requires probable cause. See United States v. Adams, 346 F.3d 1165, 1169 (8th Cir. 2003). "'To determine the existence of probable cause, we look at the totality of the circumstances as set forth in the information available to the officers at the time of the arrest.'" Id. (quoting United States v. Kelly, 329 F.3d 624, 628 (8th Cir. 2003)). "We will find that probable cause existed at the time of arrest when the available facts and circumstances are sufficient to warrant a person of reasonable caution to believe that an offense was being or had been committed by the person to be arrested. " Id. (citing same); see also United States v. Oropesa , 316 F.3d 762, 768 (8th Cir. 2003) (finding that probable cause "'exists when at the moment of arrest police have knowledge of facts and circumstances grounded in reasonably trustworthy information sufficient to warrant a belief by a prudent person that an offense has been or is being committed by the person to be arrested.'") (quoting United States v. Hartje, 251 F.3d 771, 775 (8th Cir. 2001)). Law enforcement officers are not required to have enough evidence to justify a conviction before they make a warrantless arrest, however, a "bare suspicion of criminal activity" is not enough to establish probable cause. Id. (citing United States v. Morales, 923 F.2d 621, 624 (8th Cir. 1991)). Courts must give law enforcement officers "'substantial latitude in interpreting and drawing inferences from factual circumstances,' but such latitude is not without limits.'" Id. (quoting Kuehl v. Burtis, 173 F.3d 646, 650 (8th Cir. 1999), quoting United States v. Washington, 109 F.3d 459, 465 (8th Cir. 1997)).

In general, statements that are the result of an illegal detention are not admissible. See United States v. Hernandez-Hernandez, 384 F.3d 562, 565 (8th Cir. 2004) (citation omitted). Further, "mere association with a known or suspected criminal...does not create probable cause to arrest." United States v. Everroad, 704 F.2d 403, 406 (8th Cir.1983) (citations omitted). "Nor is probable cause established by the presence of a person in a location known to be frequently involved in narcotics sales or other crimes." Id. (citations omitted). Likewise, the fact that an individual was in the company of a person who the police had probable cause to arrest, or that an individual was present at the scene where a search warrant was being executed, standing alone, would not establish probable cause to arrest that individual. United States v. Capers, 685 F.2d 249, 251 (8th Cir. 1982) (citations omitted).

In the present case, officers had the following information to support a finding of probable cause to arrest Nyberg. Nyberg was identified as one of two residents of the XXX West 104th Street house by CD #2. The cooperating defendants also stated that the grow operation had been in operation for several years. Because both she and Mims lived in the house, officers could have easily concluded, as they did here, that "the persons living in the residence are responsible for" the marijuana growing in the residence. Partial Hearing Transcript, p. 16. See United States v. Clark, 754 F.2d 789, 791-92 (8th Cir. 1985) (law enforcement could have reasonably concluded that, as a witness to her husband's suspicious behavior, defendant was aware of the criminal nature of the transaction being conducted). In United States v. Hillison, the Ninth Circuit held that association with suspected criminals can justify a finding of probable cause when "additional circumstances" exist. 733 F.2d 692, 697 (9th Cir. 1984). The court

noted that "[o]ne important consideration in assessing the significance of the association is whether the known criminal activity was contemporaneous with the association. Another is whether the nature of the criminal activity is such that it could not normally be carried on without the knowledge of all persons present." Id. (citations omitted). Here, Nyberg lived in the same house with the suspected criminal and the criminal activity had been and was occurring in the basement of the house for a considerable period of time. Furthermore, the nature of the activity here – a large-scale marijuana grow – could not be carried out without Nyberg's knowledge. Approximately 200 mature marijuana plants were found in the basement, along with the equipment and set-up to grow the plants. At least two people – CD #1 and Robert Smith, who accompanied CD #2 – had been to the house to purchase narcotics. The house consumed substantially more electricity than neighboring houses.

Based on the totality of the circumstances, a reasonable person in the position of the arresting officers, had sufficient information to warrant the reasonable belief that Nyberg was involved in the criminal activities at her home. As such, the Court finds that probable cause supported Nyberg's arrest.

   2.   Statement

On January 31, 2008, following her arrest, Nyberg was interviewed at the Bloomington Police Department by Officer Stroshane and Special Agent Doug Henning following the administration of the Miranda warnings. Nyberg claims that her statement should be suppressed because it was given involuntarily. Specifically, she asserted that she had no choice but to submit to the interview because she was interviewed in a

closed room without windows or an exit. Nyberg Mot. to Suppress, p. 1. [Docket No. 52].

Miranda v. Arizona requires that an individual be advised of her right to be free from compulsory self-incrimination and the right to the assistance of an attorney anytime the individual is taken into custody for questioning. Miranda v. Arizona, 384 U.S. 436, 444 (1966); see also United States v. Griffin, 922 F.2d 1343, 1347 (8th Cir. 1990). As a preliminary matter, the Court notes that there is no dispute that Nyberg was in custody at the time the statements were made, and that she was therefore entitled to a reading of his Miranda rights. There is also no dispute that Nyberg properly received and acknowledged the Miranda warnings. Rather, Nyberg maintained that the statements she gave after she waived her Miranda rights were involuntary due to the circumstances of the interview.

"Although the requirement that a Miranda warning be given does not dispense with the voluntariness inquiry, 'cases in which a defendant can make a colorable argument that a self-incriminating statement was compelled despite the fact that the law enforcement authorities adhered to the dictates of Miranda are rare.'" Simmons v. Bowersox, 235 F.3d 1124, 1132 (8th Cir. 2001) (quoting Dickerson v. United States, 530 U.S. 428 (2000)). Where, as here, there is no argument that Nyberg's initial waiver of her Miranda rights was validly obtained, Nyberg must then show that her subsequent statements were the product of coercion. Coercive police activity is a necessary predicate to the finding that a statement was made involuntarily. Colorado v. Connelly, 479 U.S. 157, 167, 107 S.Ct. 515, 522 (1986). "In considering whether a [statement] was voluntary, the determinative question is whether the [statement] was extracted by

27

threats, violence, or promises (express or implied), such that the defendant's will was overborne and his or her capacity for self-determination was critically impaired." United States v. Pierce, 152 F.3d 808, 812 (8th Cir. 1998) (citing Sumpter v. Nix, 863 F.2d 563, 565 (8th Cir. 1988) (citation omitted)). "In making this determination, courts look at the totality of the circumstances, including the conduct of the law enforcement officials and the defendant's capacity to resist any pressure." Id. (citing United States v. Meirovitz, 918 F.2d 1376, 1379 (8th Cir.1990), cert. denied, 502 U.S. 829, 112 S.Ct. 101, 116 L.Ed.2d 71 (1991)).

Officer Stroshane testified that the interview took place in a room without a window and he was not armed during the interview. Partial Hearing Transcript pp. 14-15. Nyberg was never told she was free to leave the interview room, nor was she given access to a phone inside the room or before the interview began. Id., p. 15. The interview was videotaped, and a recorded copy of Nyberg's videotaped interview was submitted to the Court at the hearing on the motions. Gov't Ex. 5.

Having considered the testimony of Officer Stroshane regarding the interview and having reviewed that interview in its entirety, the Court finds that the tactics used by Officer Stroshane during his interview of Nyberg did not render her statement involuntary. The interview began with some basic biographical questions directed to Nyberg, such as her name and address and employment, and Officer Stroshane and Special Agent Doug Henning explained why she had been arrested. Officer Stroshane then clearly read Nyberg her Miranda rights and Nyberg verbally waived those rights. The interview lasted approximately 37 minutes and was conducted in an even, conversational tone throughout. No threats or promises were made to Nyberg during

the interview. No voices were raised. Nyberg was cooperative, appeared to understand the questions asked, and answered all of the questions asked in full detail.

Based on these facts, the Court finds that Nyberg voluntarily submitted to the interview and was not coerced into providing a statement. The fact that the interview took place in a windowless room, and that she was not free to exit the room or was not given access to a phone did not amount to coercive conduct on the part of the officers such that this Court could conclude that Nyberg's will was overborne. See United States v. LeBrun, 363 F.3d 715, 722-723 (8th Cir. 2004) (circumstances of interview were not coercive where defendant was interviewed in a small windowless room for approximately a half hour); United States v. Galceran, 301 F.3d 927, 930-31 (8th Cir. 2002) (ninety-eight minute interview in windowless conference room by two officers not found to be coercive). While it is true that Nyberg was not free to exit the room, it was because she was under arrest and in custody at that point. She was not going to be free to leave whether she spoke to the interviewing officers or not. Furthermore, the fact that Nyberg was not given a phone did not amount to coercion. There is no claim that Nyberg requested the use of a phone and was denied access to a phone. Not offering access to a telephone is not the same as denying access to a telephone. See e.g. United States v. Simmons, 526 F.Supp.2d 557, 573 (E.D.N.C. 2007) (denial of telephone access was non-coercive, especially in the absence of facts suggesting defendant wanted to call an attorney or that defendant would continue to be denied telephone access if he did not submit to an interview); United States v. Taylor, 2004 WL 97653 at *8 n. 4 (N.D.Iowa Jan. 6, 2004) (although defendant was not permitted to make a telephone call, court failed to see how this created a coercive atmosphere given

29

that defendant did not ask to speak to an attorney nor did he invoke his right to remain silent). The circumstances of Nyberg's interview were not coercive.

For all of these reasons, the Court finds that the officers had probable cause to arrest Nyberg and her post-<u>Miranda</u> statement was voluntarily given. Therefore, this Court recommends that her motion to suppress her statements should be denied.

### B. Kreisel's Motion to Suppress Statements, Admissions and Answers [Docket No. 57]

On February 1, 2008, Officer Stroshane and Detective Otterness conducted an interview of Kreisel at the Bloomington Police Department. In order to conduct the interview, Kreisel was taken out of his holding cell where he was sleeping. Officer Stroshane testified that he came into the cell and asked Kreisel to come out. <u>See</u> Partial Hearing Transcript, p. 19. Kreisel woke up and then walked into the interview room. <u>Id.</u>

Kreisel moved to suppress his statements on the basis that his waiver of <u>Miranda</u> was not voluntarily, intelligently, or knowingly given. Kreisel Post-Hearing Mem. in Support of Mot. to Suppress Statements, pp. 1-2 [Docket No. 77]. Kreisel claimed that at the time he waived his <u>Miranda</u> rights, he was tired, hungry and not in control of his faculties. <u>Id.</u> at p. 2. He further argued that even if his consent was found valid, the statement should be suppressed because the consent was tainted by the illegal search of his home and lead to his illegal arrest. <u>Id.</u> Because the Court has found that the search of Kreisel's home was valid, this claim is without merit, and the Court addresses only the argument that Kreisel's consent to be interviewed was involuntary.

A waiver of <u>Miranda</u> rights is valid if it satisfies the following criteria: "First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." <u>United States v. Turner</u>, 157 F.3d 552, 555 (8th Cir. 1998) (citing <u>United States v. Jones</u>, 23 F.3d 1307, 1313 (8th Cir. 1994)). "The determination of whether an accused has knowingly and voluntarily waived his <u>Miranda</u> rights depends on all the facts of each particular case." <u>Stumes v. Solem</u>, 752 F.2d 317, 320 (8th Cir. 1985) (citing <u>Fare v. Michael C.</u>, 442 U.S. 707, 724-25, 99 S.Ct. 2560, 2571-72, 61 L.Ed.2d 197 (1979)). Only if the "'totality of the circumstances surrounding the interrogation'" reveals both an uncoerced choice and the requisite level of comprehension may this Court properly conclude that the defendant's <u>Miranda</u> rights have been waived. <u>See</u> <u>Moran v. Burbine</u>, 475 U.S. 412, 421, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410 (1986) (quoting <u>Fare</u>, 442 U.S. at 725, 99 S.Ct. at 2571).

A video recording of Kreisel's interview was submitted to the Court as Government's Exhibit 6. The Court has reviewed that interview in its entirety. Kreisel's interview lasted approximately 52 minutes. At the beginning of the interview, Officer Stroshane went over basic biographical questions with Kreisel, such as his name, birthdate and employment. Officer Stroshane clearly read Kreisel his <u>Miranda</u> rights, Kreisel acknowledged that he understood his rights,[7] and then began to talk to the

---

[7]     On the video recording of Kreisel's interview, Kreisel's acknowledgement of his rights was in the form of a nod accompanied by inaudible speech that appears

interviewing agents. At no time during the interview did Kreisel indicate that he was uncomfortable or that he needed anything. The circumstances surrounding Kreisel's interview were neither coercive nor intimidating in any manner. The interview was conducted in a reasonable and conversational tone.

The thrust of Kreisel's argument is that he was tired and hungry by the time he waived his Miranda rights. However, there is no evidence to support this assertion. To the contrary, during his interview, Kreisel never mentioned that he was too tired or hungry to continue, and while he yawned and stretched occasionally during the proceeding, it is apparent that he was coherent and in control of his faculties. There is nothing to indicate that Kreisel's waiver of his Miranda rights was not voluntarily, intelligently, or knowingly given. Kreisel's motion to suppress his statement should be denied.

## IV. Motions to Declare Title 21 U.S.C. 841(b)(1)(B)(vii) Unconstitutional [Docket Nos. 53, 69]

Both Nyberg and Kreisel moved to declare 21 U.S.C. § 841(b)(1)(B)(vii) unconstitutional, and Mims joined in these motions. The basis for their arguments is

---

affirmative in nature. Officer Stroshane then asked Kreisel if he wanted to talk, and Kreisel again makes the same type of movement and inaudible sound. While the Court is comfortable that Kreisel's responded affirmatively when he was asked if he understood his rights and if he wanted to talk to the officers, given that Kreisel's speech was unclear and the explicitness of his waiver could be questioned, the Court finds that Kreisel's waiver was also implied by the fact that he continued with the interview and fully answered questions. A defendant's willingness to answer questions after acknowledging his Miranda rights is sufficient to constitute an implied waiver. See Burket v. Angelone, 208 F.3d 172, 198 (4th Cir. 2000); see also United States v. Manduiano, No. CR. 03-178(2) (JRT/FLN), 2003 WL 22076577 at *4 (D. Minn. Aug. 22, 2003) ("Waiver can be inferred by conduct, and a willingness to answer questions after acknowledging Miranda rights is sufficient to constitute an implied waiver.") (citations omitted).

that while the penalty provision was designed to punish large-scale operators, the statute, by equating one marijuana plant to one kilogram of marijuana, is arbitrary, and the mandatory minimum of five years prescribed by the statute results in sentencing disparities for smaller dealers and suppliers. Consequently, defendants asserted the 21 U.S.C. § 841(b)(1)(B)(vii) lacks a rational basis and violates their constitutional rights of due process and equal protection. Nyberg further maintained that the statute discriminates against a class of defendants who neither grow nor sell marijuana, or who like herself, are merely an innocent companion of a grower.

All three defendants are charged with a conspiracy to manufacture and distribute marijuana, in violation of 21 U.S.C. §§ 841(b)(1)(B) and 846. Section 841(b)(1)(B)(vii) provides the penalty for a person convicted of this crime. It states:

> In the case of a violation of subsection (a) of this section involving –
> * * *
> (vii) 100 kilograms or more of a mixture or substance containing a detectable amount of marijuana, or 100 or more marijuana plants regardless of weight;
> * * *
> such person shall be sentenced to a term of imprisonment which may not be less than 5 years and not more than 40 years. . . .

In 1995, the United States Sentencing Guidelines amended Guideline 2D1.1 and adopted an equivalency of 100 grams of marijuana per plant. See U.S.S.G. App. C, Amend. 516 (Nov. 1995). Prior to 1995, the commentary to the guideline stated that "[i]n cases involving fifty or more marihuana plants, an equivalency of one plant to one kilogram of marihuana is derived from the statutory penalty provisions of 21 U.S.C. § 841(b)(1)(A), (B), and (D). In cases involving fewer than fifty plants, the statute is silent as to the equivalency. For cases involving fewer than fifty plants, the Commission has

33

adopted an equivalency of 100 grams per plant, or the actual weight of the usable marihuana, whichever is greater." The commentary was amended to state that "[f]or marihuana plants, the Commission has adopted an equivalency of 100 grams per plant, or the actual weight of the usable marihuana, whichever is greater." U.S.S.G. 2D1.1, Commentary to the 1995 Amendments. The commentary to the 1995 amendments also stated that the reason for the amendment is that "[i]n actuality, a marihuana plant does not produce a yield of one kilogram of marihuana." Id. Defendants cited to the sentencing guidelines as support for their claim that the ratio provided by the statute's penalty provision is arbitrary.

The very same arguments made by the defendants have been rejected by the Eighth Circuit both before and after the amendment to the Guidelines in 1995. In United States v. Coones, the Eighth Circuit found that the marijuana equivalency provision was rational, holding that "Congress intended to punish marijuana growers based on their place in the chain of distribution, rather than on the predictable yield of their plants." 982 F.2d 290, 292 (8th Cir. 1992) citing to United States v. Smith, 961 F.2d 1389, 1390 (8th Cir. 1992). In Ulrich v. United States, the defendant contended that the imposition of not less than five years imprisonment for manufacturing 100 or more marijuana plants regardless of weight under 21 U.S.C. § 841(b)(1)(B)(vii) was irrational and violated his due process and equal protection rights. 2 F.3d 1154, 1993 WL 309602 at *1 (8th Cir. 1993). The Eighth Circuit disregarded both arguments as well as the assertion that the statute's one plant to one kilogram ratio was irrational. See id. (citing United States v. Murphy, 979 F.2d 287, 290-91 (2d Cir. 1992); United States v. Smith, 961 F.2d 1389, 1390 (8th Cir. 1992)). In Smith, the Eighth Circuit, in upholding the constitutionality of

34

21 U.S.C. § 841(b)(1)(B)(vii) and its companion sentencing guideline, cited to the various circuits that had reached the same conclusion. See Smith, 961 F.2d at 1390 (citing United States v. Lee, 957 F.2d 778, 784 (10th Cir. 1992) (section 841(b)(1)(B)(vii)'s five-year minimum for 100 plants or 100 kilograms does not violate equal protection)[8]; United States v. Belden, 957 F.2d 671, 675-76 (9th Cir. 1992) (U.S.S.G. § 2D1.1 withstands due process challenge); United States v. Webb, 945 F.2d 967, 968-69 (7th Cir. 1991) (U.S.S.G. § 2D1.1 constitutional), cert. denied, 502 U.S. 1116, 112 S.Ct. 1228, 117 L.Ed.2d 463 (1992); United States v. Lewis, 762 F.Supp. 1314, 1315-17 (E.D.Tenn.) (same), aff'd., 951 F.2d 350 (6th Cir. 1991) (Table)). The court observed:

> The cases suggest Congress intended to account for the heightened culpability of growers because of their primacy in the distribution chain, rather than to punish them based on the predictable yield of their plants. See Lee, 957 F.2d at 784 (Congress intended to punish growers by scale or potential of operation, not weight of plants; cultivation creates greater potential for abuse than possession); Belden, 957 F.2d at 675-76 (equating one plant with one kilogram rationally related to recognition of higher level of culpability of growers, who operate at top of distribution chain); Lewis, 762 F.Supp. at 1317 (Congress may have equated one

---

[8]    In Lee, the Tenth Circuit relied in part on the decision in District of Minnesota case, United States v. Fitol, 733 F.Supp. 1312 (D.Minn. 1990), where Judge Devitt stated in connection with the defendant's challenge to the meaning of a marijuana plant under 21 U.S.C. § 841(b)(1)(B)(vii):

> It seems clear, however, that by changing the determining factor from weight to number of "plants regardless of weight," Congress intended to punish growers of marihuana by the scale or potential of their operation and not just by the weight of the plants seized at a given moment. Congress must have found a defendant who is growing 100 newly planted marihuana plants to be as culpable as one who has successfully grown 100 kilograms of marihuana.

Lee, 957 F.2d at 784 (quoting Fitol, 733 F.Supp. at 1315).

plant with one kilogram based on culpability not weight). Viewed in this light, the challenged ratio is not irrational.

Smith, 961 F.2d at 1390

After the sentencing guidelines were amended in 1995 to adopt the equivalency of 100 grams per plant, the Eighth Circuit again upheld its prior decisions, finding that § 841 was constitutional despite the fact that the equivalencies in the sentencing guidelines and in the sentencing provision of the statute conflicted. See United States v. Marshall, 95 F.3d 700 (8th Cir. 1996). In Marshall, like here, the defendant was charged with manufacturing and possessing with intent to manufacture in excess of 100 marijuana plants, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B). Id. The defendant argued that § 841(b)(1)(B)(vii)'s five-year minimum based on the number of plants at issue was arbitrary and capricious. Id. at 701. In upholding the constitutionality of § 841(b)(1)(B)(vii), the Eighth Circuit stated:

> On appeal, Marshall argues that Amendment 516 made the statutory minimum sentence arbitrary and capricious . . .
>                                  * * *
> We conclude that the District Court properly resentenced Marshall to sixty months imprisonment. Amendment 516 could not be applied to lower Marshall's sentence below the statutory mandatory minimum. See U.S.S.G. § 5G1.1(c)(2); United States v. Silvers, 84 F.3d 1317, 1325 (10th Cir.1996). We have previously held that section 841(b)(1)(B)(vii) and its concomitant mandatory minimum sentence provision are constitutional, see United States v. Coones, 982 F.2d 290, 292 (8th Cir.1992), and we conclude that Amendment 516 did not render it unconstitutional, cf. United States v. Stoneking, 60 F.3d 399, 402-03 (8th Cir.1995) (en banc) (finding that Sentencing Commission could not establish new mandatory minimum sentences by amending Guidelines, and that dual weight method for offenses involving LSD did not violate due process because it was rational basis for punishment), cert. denied, 516 U.S. 1119, 116 S.Ct. 926, 133 L.Ed.2d 855 (1996).

95 F.3d at 701.

Despite the unequivocal jurisprudence in the Eighth Circuit upholding the constitutionality of 21 U.S.C. § 841(b)(1)(B)(vii), Kreisel nevertheless suggested that he was not claiming that the guidelines trumped the statute or that the guideline rendered the statute unconstitutional; rather, he asserted that the effect of the statute was to apply the mandatory minimum to lower level offenders instead of the major growers as intended by Congress. Kreisel Post-hearing Mem. in Support of Def. Mot. to Decl. 21 U.S.C. § 841(b)(1)(B) Unconst., p. 4 [Docket No. 79]. However, this argument ignored the language of the statute and its rational underpinnings. As the Tenth Circuit observed in Lee:

> All legislation involves classification. The fact that some persons who have almost equally strong claims to particular treatment are placed on different sides of the line, does not render legislation irrational; although the line may have been drawn differently, still this is a matter of legislative rather than judicial consideration. The Supreme Court has made it clear that statutory classifications will be set aside as violative of equal protection only if no grounds can be conceived to justify them as rationally related to a legitimate state interest.

Lee, 957 F.2d at 782 (emphasis added).

Here, §841(b) has a rational basis for its sentencing scheme, where there are commensurate penalty provisions for those found with varying amounts of plants. Congress provided a higher-level sentence for major growers – there is a ten-year mandatory minimum for those found with 1,000 plants or more. See 21 U.S.C. §841(b)(1)(A)(vii). At the other end of the spectrum, Congress set a lower sentence for those found with fewer plants – where an individual possesses less than 50 kilograms of marijuana, except in the case of 50 or more marijuana plants regardless of weight, such person shall be sentenced to a term of imprisonment of not more than 5 years. See 21

37

U.S.C. §841(b)(1)(D). Under the statutory scheme, when an individual is found to possess a specific number of plants, they are considered to be culpable commensurate with the sentence provided by the statute. The penalty with which defendants are charged is the corresponding penalty for the amount of plants they have been charged with possessing. If they possessed fifty or fewer plants, they would not be facing a mandatory minimum, but instead a five-year maximum. If they possessed 1,000 or more plants, they would be facing a higher mandatory minimum. The penalty provision applied to the allegations against the defendants is not disproportionate under the statute – it corresponds directly and rationally to the magnitude of the grow operation. Those persons involved in more sizeable grow operations will spend more time in prison than those persons involved in smaller enterprises.

Finally, Nyberg's claims that the statute violates her rights to equal protection because it discriminates against a class of persons who, like she, are mere occupants of a home and not growers or dealers, is premised on the conclusion that she is innocent of the charges lodged against her – that she conspired with Mims and Kreisel to manufacture and distribute marijuana. However, at the risk of stating the obvious, Nyberg's actual role in the charged offenses has not been established. If she is found innocent of the conspiracy charge, she will go free and no statute will dictate otherwise. Stated otherwise, no criminal statute can discriminate against persons who are determined to be innocent. Nyberg's constitutional challenge based on the equal protection clause has no basis in fact or law.

In light of the precedents of the Eighth Circuit, defendants' motions to declare 21 U.S.C. § 841(b)(1)(B)(vii) unconstitutional should be denied.

## **RECOMMENDATION**

For the reasons set forth above, it is recommended that:

1.     Jimmie Glen Mims' Motion to Suppress Evidence Obtained as a Result of Search and Seizure [Docket No. 39] be DENIED.

2.     Elizabeth Ann Nyberg's Motion to Suppress Search and Seizure [Docket No. 51] be DENIED.

3.     Elizabeth Ann Nyberg's Motion to Suppress Statements [Docket No. 52] be DENIED.

4.     Elizabeth Ann Nyberg's Motion to Declare Title 21 U.S.C. 841 Unconstitutional [Docket No. 53] be DENIED.

5.     Robert Allen Kreisel's Motion to Suppress Statements, Admissions and Answers [Docket No. 57] be DENIED.

6.     Robert Allen Kreisel's Motion to Suppress Evidence Obtained as a Result of Search and Seizure [Docket No. 61] be DENIED.

7.     Robert Allen Kreisel's Motion to Declare Title 21 U.S.C. Sec. 841(b)(1)(B)(vii) Unconstitutional [Docket No. 69] be DENIED.


Dated:     May 12, 2008

JANIE S. MAYERON
United States Magistrate Judge

Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties on or before May 28, 2008, a copy of this Report, written objections which specifically identify the portions of the Report to which objections are made and the bases for each objection.